**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| A.W. and Her Mother | § | |
| MARY KING-WHITE, | § | |
| | § | Civil Action No. _____ |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| HUMBLE INDEPENDENT SCHOOL | § | |
| DISTRICT, AMANDA MICHELLE | § | JURY DEMANDED |
| FEENSTRA, GUY SCONZO, CHARLES | § | |
| NED, JUAN MELENDEZ, TAMMY | § | |
| MCHALE, CRAIG STOWERS and | § | |
| ALICIA NARCISSE, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

COME NOW Mary King-White, Individually and as Mother to A.W., and A.W., a minor at the time of the accrual of a portion of the actions complained of, to bring this action against Humble Independent School District, Amanda Michelle Feenstra, Guy Sconzo, Charles Ned, Juan Melendez, Tammy McHale, Craig Stowers, and Alicia Narcisse (collectively referred to as "Defendants") with this Original Complaint allege as follows:

**I.
NATURE AND PURPOSE OF THE ACTION**

1.     This case is very tragic.  An educator abused her position, befriended a vulnerable child, deferred acting until she gained the trust of the child and the child's mother, and then took advantage of the child by sexually abusing her and emotionally scarring her.

2.     From 2009 to 2011, while Amanda Feenstra ("Feenstra") was employed as the dance and drill team instructor at Humble High School, she spent an inordinate amount of personal time with A.W., taking her on out of town school trips and often sharing a room with the minor.  Feenstra also took the minor alone on personal trips away from the school grounds

during the school day.  These actions were observed by and known to other Humble High School teachers and administrators.  The minor was sexually abused repeatedly, made to participate in immoral sex acts, and is likely emotionally scarred for life, as a result of Feenstra's actions, and the inaction of the Humble High School teachers and administrators who observed the signs of the sexual abuse and did nothing.

3.     Plaintiffs also allege that Defendants had a duty, but failed to implement policies, practices and procedures that respected Plaintiffs' constitutional rights to assistance, education, protection, medical treatment, and equal treatment under the law.  Defendants' failure to implement the necessary policies and the implementation of unconstitutional custom or policies deprived A.W. of equal protection and due process under the Fourteenth Amendment and caused her unwarranted physical pain and mental anguish.  For these civil rights' violations, and other causes of action discussed herein, Plaintiffs seek answers and compensation for their damages.

4.     Plaintiffs bring this action under 20 U.S.C. § 1681, 42 U.S.C. §§ 1983 and 1988; the Fourteenth Amendment to the United States Constitution; Tex. Civ. Prac. & Rem. Code §§ 71.002 and 71.021 and other constitutional provisions and laws of the United States and the State of Texas, to recover damages resulting from Defendants' conduct, while A.W. sought protection, medical treatment, education and assistance from Defendants, and for the deprivation of her rights under color of law and in violation of federal law.

## II.
## JURISDICTION AND VENUE

5.     This court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 since Plaintiffs are suing for relief under 20 U.S.C. § 1681 and 42 U.S.C. §1983. This Court has jurisdiction over Plaintiffs' other claims under principles of pendent, ancillary and supplemental jurisdiction under 28 U.S.C § 1367.

6.     Venue is appropriate in the United States District Court; Southern District of Texas, Houston Division, since this district is the location of most of the events made the basis of Plaintiffs' claim for relief.

### III.
### PARTIES

7.     Plaintiff Mary King White is an individual who resides in Harris County, Texas.

8.     Plaintiff A.W. was a minor during most of the events that give rise to this lawsuit and is currently a resident of Harris County, TX.

9.     Defendant Humble Independent School District ("Humble ISD") is a municipality of the State of Texas.  Humble ISD may be served by delivery to its Superintendent, Guy Sconzo, at its business address:  20200 Eastway Village Dr., Humble, TX 77338.

10.     Humble ISD funds and operates Humble High School, which, along with its principal, assistant and associate principals, counselors, and other agents, is responsible for the implementation of the Humble ISD policies, procedures, practices, customs, the purported sexual abuse and discrimination policies, as well as for the acts and omissions challenged by this suit. Humble ISD and the other Defendants, as well as Humble High School, are also responsible for abuse prevention, investigative, and enforcement services for all students in the Humble ISD.

11.     Defendant Humble ISD is also responsible for ensuring that all of its facilities, including its schools, are in compliance with federal and state law, department or agency policies, rules, and regulations, and related standards of care.

12.     Defendant Amanda Michelle Feenstra ("Feenstra") is an individual residing in Texas.  She may be served at: 20615 Sunny Shores, Humble, TX  77346.

13.     Defendant Guy Sconzo ("Sconzo), who at the relevant times alleged herein served as the Humble ISD superintendent, is an individual residing in Texas, and is being sued in his

official and individual capacities.  He may be served at his business address:  20200 Eastway Village Dr., Humble, TX 77338.

14.     Defendant Charles Ned ("Ned"), who at the relevant times alleged herein served as the principal of Humble High School, is an individual residing in Texas, and is being sued in his official and individual capacities.  He may be served at his business address:  1700 Wilson Rd., Humble, TX 77338-6118.

15.     Defendant Juan Melendez ("Melendez"), who at the relevant times alleged herein served as the assistant principal of Humble High School, is an individual residing in Texas, and is being sued in his official and individual capacities.  He may be served at his business address: 8540 C.E. King Parkway, Houston, TX 77044.

16.     Defendant Tammy McHale ("McHale"), who at the relevant times alleged herein served as the assistant principal of Humble High School, is an individual residing in Texas, and is being sued in her official and individual capacities.  She may be served at her business address:  1700 Wilson Rd., Humble, TX 77338-6118.

17.     Defendant Craig Stowers ("Stowers"), who at the relevant times alleged herein served as the assistant principal of Humble High School, is an individual residing in Texas, and is being sued in his official and individual capacities.  He may be served at his business address: 1700 Wilson Rd., Humble, TX 77338-6118.

18.     Defendant Alicia Narcisse ("Narcisse"), who at the relevant times alleged herein served as a counselor at Humble High School, is an individual residing in Texas, and is being sued in her official and individual capacities.  She may be served at her business address:  1700 Wilson Rd., Humble, TX 77338-6118.

19.     Defendant Humble ISD is, and/or was, the employer of Feenstra, Sconzo, Ned, McHale, Melendez, Stowers, and McHale (collectively referred to as the "School Officials") and is responsible for the acts and/or omissions of the School Officials that were performed in the course and scope of their employment.

## IV.
## STATE ACTION

20.     To the extent applicable, Defendants were acting under color of state law when they subjected A.W., and Mary King White to the wrongs and injuries hereinafter set forth.

## V.
## ADDITIONAL FACTS PARTICULAR TO PLAINTIFFS' CLAIMS

### A.W., BEFORE THE ASSUALTS BEGAN

21.     During the 2007-2008 and 2008-2009 school years, A.W. was a well-known and well-liked student at Humble High School.  She received good grades in her classes, played tennis, was a part of the Christian Student Union, and was active in Speech & Debate.

22.     During the 2007-2008 school-year, A.W. was the first freshman in Humble High School's history to dance with the High School's dance team.

23.     During this period, A.W. had a great relationship with her classmates and dance teammates.  She received numerous awards for her dancing abilities and other activities.  In April 2008, while still a freshman student, A.W. was voted as the 2nd Captain of the Humble High School Wildcatdets dance team.

24.     In or about April 2009, during competitive tryouts for the Wildcatdets line dancers and dance officers, A.W. was chosen as the "Colonel" for the Humble High School Wildcatdets dance team, which meant she was the leader of the dance team and was responsible for working with the dance instructors to develop dance routines for the Wildcatdets dance team.

As the team's Colonel, A.W. was also expected to lead the Wildcatdets team during all dance practices, during games, and at all dance competitions.

**FEENSTRA ARRIVES AT HUMBLE HIGH**

25.     In or about March 2009, Humble High School decided to conduct a search for a new lead dance instructor to replace the previous head dance instructor.  Feenstra was one of the candidates among the potential hires.  At the time of her consideration, Feenstra indicated that she had previously served as dance instructor at other schools, including at North Shore Senior High, Houston Community College, and Wesley Elementary School.

26.     During the time Humble High School was searching for a new dance instructor, Feenstra was shown video of A.W. carrying out dance routines on previous occasions.  While Feenstra watched videotapes of A.W. performing various dance routines, including from the Wildcadets' 2008 dance performance, school employees noticed that Feenstra expressed an unusual and bizarre admiration of certain of A.W.'s physical features.

27.     Although some school officials argued against Feenstra's selection as the new dance instructor, since they did not have a good feeling about her, Feenstra was eventually chosen as the new dance instructor by the principal, assistant principals, and some of the others involved in the selection process.

28.     Shortly after she was hired, Feenstra quickly began to schedule various meetings with A.W., allegedly in order to begin developing routines to get the Wildcatdets dance team in line with Feenstra's plans for the team.

**FEENSTRA INITIATES HER DESPICABLE PLAN**

29.     As soon as she took over control of Humble High School's Wildcatdets dance team, Feenstra instructed A.W., who was a 16-year old minor at the time that A.W. had to spend

substantially all of her after-school time with Feenstra, instead of with A.W.'s dance teammates or her family. This was the beginning of the manipulation and isolation that Feenstra used to gain A.W.'s trust and confidence.

30.    Feenstra also began to speak regularly and authoritatively with Mary King White, A.W.'s mother, in order to convince the mother to allow A.W. to spend more after-school time working with Feenstra.  Feenstra told A.W.'s mother that Feenstra needed to spend the additional with A.W. in order to permit Feenstra to make A.W. a better leader and dancer for the upcoming school year.

31.    While working with A.W., Feenstra also influenced A.W. to discuss the struggles in A.W.'s personal and family life with Feenstra, which Feenstra would use later to turn A.W. against her friends and family.

32.    Over the subsequent weeks, Feenstra constantly indicated to A.W. that A.W.'s teammates were all jealous of A.W.  Feenstra engaged in other manipulative conduct with A.W. and her teammates that led to A.W. isolating herself from her friends and dance teammates, interacting with them only on a limited as-needed basis.

33.    Feenstra managed to convince A.W.'s mother to allow A.W. routinely to visit Feenstra at her home under the pretext that A.W. would be developing and practicing various dance routines for the team.

34.    Feenstra also visited A.W.'s home most nights and early in the mornings, all under the pretense that she and A.W. needed to discuss team strategy and dance routines for the team.

35.    In addition, Feenstra began to attend A.W.'s outside dance performances and attended A.W.'s church frequently.

36.     In various contexts, Feenstra would refer to herself as A.W.'s "second mother" and would nod approvingly when others referred to her that way.

37.     Feenstra stated repeatedly to A.W. and A.W.'s mother that Feenstra had big educational plans for A.W., including helping her into and a scholarship from the University of Houston, which is Feenstra's alma mater.

38.     Feenstra constantly told A.W. that A.W.'s mom was an obstacle in A.W.'s life and that A.W. needed to remove herself from living with and being around her mom.

39.     Feenstra's actions were designed to, and did, cause A.W. to view Feenstra as her only supporter at the school and isolate A.W. from her family and teammates.

**FEENSTRA MAKES THE MOVE ON A.W.**

40.     Shortly after Feenstra felt that she was having success with getting A.W. to believe that Feenstra was her only confidante, Feenstra caused A.W., as well as Feenstra's lies, to persuade A.W.'s mother to allow Feenstra to pick A.W. up from home and take her to and from dance practices, dance competitions and the high school.

41.     In the spring of 2009, while Feenstra was taking A.W. home from a dance practice, A.W. began to fall asleep in Feenstra's car, exhausted from a long day at practice. Feenstra pulled up to A.W.'s home and put her car in park.  Without warning, Feenstra leaned over towards A.W., groped her and kissed her on the lips.  As A.W. woke up from a half-asleep state, she was startled and confused about what happened.  A.W. got out of Feenstra's car and went into the house – a 16 year old girl afraid to tell anyone what happened.

42.     Over the next few weeks, A.W. tried to avoid interacting with Feenstra as A.W. was still trying to comprehend what happened in the car.  She was also afraid of what Feenstra would do to her if she encountered her or reported her.

43.     Despite A.W.'s efforts to avoid Feenstra, Feenstra eventually ordered A.W. to meet with her.  During their encounter, Feenstra told A.W. that what happened in the car was inappropriate and that it should not have happened.  In a threatening fashion, Feenstra instructed A.W. not to tell anyone, or both of them would be in trouble.  Fearing the consequences of reporting what happened in Feenstra's car, a 16-year old A.W. remained quiet.

44.     Over the next few months, Feenstra continued to harass A.W. to talk to her and visit her.  Feenstra did what she could to make sure that A.W. was isolated from her friends and family, creating a scenario where Feenstra was the only person with whom A.W. felt she could confide and associate.  Feenstra used to her advantage that A.W. wanted badly to remain a dancer at Humble High School and hopefully receive a college scholarship in dance.

## FEENSTRA BEGINS TO ENGAGE IN DEVIATE SEX WITH A.W.

45.     Eventually, Feenstra convinced A.W. to move into Feenstra's residence with Feenstra and Feenstra's husband.  Although A.W.'s mother initially objected, Feenstra told A.W.'s mother that the move-in was in A.W.'s best interest, since it would allow A.W. to work on dance routines with Feenstra, help develop A.W.'s leadership skills, and help Feenstra mold A.W. for college.

46.     Given that Feenstra had already convinced A.W. to insist to her mother that the move-in was in A.W.'s best interest and considering that Feenstra was married and living with her husband, A.W.'s mother consented.  Also, A.W's mother felt that perhaps Feenstra's husband would be able to provide safety for her daughter from danger from third-parties such as burglars, etc.

47.     Shortly after A.W. moved into Feenstra's home, Feenstra began her sadistic plan of turning A.W. into Feenstra's sexual toy.

48.     Knowing that A.W. had never before engaged in any form of sex, Feenstra's strategy began by dry-humping A.W. on occasions as well as constantly hugging and touching her.  Feenstra would confuse A.W. by persistently telling her that she loved her, which A.W. initially assumed to be in a "motherly" way.

49.     Feenstra ultimately moved up to kissing and licking A.W.'s vagina with her tongue (cunninlingus).  Feenstra also personally shaved A.W.'s vagina on occasions.  These acts, which Feenstra described to A.W. as acts of love, were all a part of Feenstra's strategy to convince A.W. to be more comfortable with Feenstra touching A.W. and engaging in oral sex with her.

50.     Feenstra even bought pornography and insisted that A.W. watch and sent naked pictures to A.W., all to manipulate A.W. into believing that it was "natural" to have sex and that everyone else was doing it.  A.W. was clearly uncomfortable with all of Feenstra's conduct but did not know where to turn since she was Feenstra's student and felt that no one at the school would support her.

51.     Eventually, Feenstra's relentless mind control over A.W. succeeded in making A.W. her "sex slave." Feenstra made A.W. stay in the guest bedroom at Feenstra's home, where Feenstra would have sex with A.W., at will, when Feenstra's husband would go out of town. The sex initially involved Feenstra performing oral sex on A.W. and penetrating into A.W.'s vagina with her fingers.

52.     Feenstra also bought numerous sex toys that Feenstra would use on or with A.W., including vibrating artificial erect penises (dildos) and other devices.  Some of the toys that Feenstra used on A.W. eventually gave A.W. numerous sores in her vaginal region because the toys were unclean.

53.     On many other occasions, Feenstra insisted that A.W. have sex with her at Humble High School, including in Feenstra's office, on the floor of school's dance room, at training camp, and after most every football game during the football season.

54.     Feenstra continued to use A.W. as her sex toy for the reminder of the time that A.W. was a student at Humble High School, subjecting her to multiple sexual assaults on the premises of Humble High School, during official school activities, in Feenstra's home and at various other locations.

## SCHOOL OFFICIALS ARE AWARE OF THE IMPROPER TEACHER-STUDENT RELATIONSHIP BETWEEN FEENSTRA AND A.W., BUT DO NOTHING

55.     During the period of Feenstra's inappropriate relationship with A.W., School Officials noticed that A.W.'s grades were changing, but did nothing to investigate or stop Feenstra's relationship or interaction with A.W.

56.     During the period of Feenstra's inappropriate relationship with A.W., parents and other students repeatedly complained about the obsessive and unusual relationship Feenstra had with A.W., but School Officials did nothing to investigate or stop Feenstra's relationship or interaction with A.W.

57.     During the period of Feenstra's inappropriate relationship with A.W., School Officials noticed that A.W. was becoming withdrawn from her classmates and teammates, but did nothing to investigate or stop Feenstra's relationship or interaction with A.W.

58.     During the period of Feenstra's inappropriate relationship with A.W., School Officials noticed that Feenstra, almost on a daily basis, would leave the school grounds alone with A.W., but did nothing to investigate or stop Feenstra's relationship or interaction with A.W.

59.     During the entire period of Feenstra's inappropriate relationship with A.W., School Officials repeatedly observed first-hand that A.W. was spending an inordinately

excessive amount of time in Feenstra's office with the doors closed, but did nothing to investigate or stop Feenstra's relationship or interaction with A.W.

60.    During the entire period of Feenstra's inappropriate relationship with A.W., School Officials knew that Feenstra went on out-of-town trips with A.W., where parents were not there as chaperons, but did nothing to investigate or stop Feenstra's relationship or interaction with A.W.

61.    During the entire period of Feenstra's inappropriate relationship with A.W., School Officials knew that while attending school-related events Feenstra was sleeping in the same bed with A.W., but did nothing to investigate or stop Feenstra's relationship or interaction with A.W.

62.    The School Officials knew that A.W. (a student) had moved into the home of a teacher (Feenstra), but did nothing to investigate or stop Feenstra's relationship or interaction with A.W.

63.    During the entire period, Humble High School had one or more police officers at the school, whose office was located next to the dance room, where several sexual assaults took place.  Yet the police did not investigate or report the late hours that Feenstra spent in the dance office with A.W.  This blatant omission clearly emboldened Feenstra.

64.    Although the School Officials would tell parents and students that they would investigate the complaints about Feenstra's relationship with A.W., they never did.

65.    Feenstra was never disciplined by Defendants for the inappropriate relationship she had with A.W. or for any of the conduct complained of herein.

66.    Feenstra, not being the subject of any surveillance or monitoring, was able to perpetrate the harassment and sexual assaults upon A.W., both at school and away.  Instead of

conducting any type of investigation of Feenstra's conduct, School Officials allowed Feenstra to have her way with A.W.

67.     Feenstra, not continually being the subject of surveillance or monitoring due to an inadequate or malfunctioning security system, was able to perpetrate the harassment and sexual assaults upon A.W., both at school and away.  Instead of conducting any type of investigation of Feenstra's conduct, School Officials allowed Feenstra to have her way with A.W.

68.     During the time A.W. was being sexually assaulted by Feenstra, all persons in power at Humble High School knew or should have known of the inappropriate relationship Feenstra had with A.W. including, but not limited to, the harassment, groping, sexual assaults, and rape that Feenstra committed upon A.W.

69.     Considering that the School Officials observed the inappropriate teacher-student relationship and did nothing to stop it, A.W. understandably felt powerless to prevent Feenstra's conduct since she had no one at the school to rely upon and protect her from this conduct.

## HUMBLE ISD'S FINAL POLICY MAKERS AND THE CUSTOMS AND POLICIES

70.     The Humble ISD School Board, its Board of Trustees and its superintendent(s), e.g. Sconzo, are the final decision-makers and policymakers for many of the customs, practices, policies and procedures complained of herein.

71.     In addition, the Humble ISD Board of trustees delegated, in part, the authority to formulate official policy on the subject of teacher/student relationships, school trips, and sexual assaults to the Humble High School principal and assistant principal, all by designation from the Humble ISD Board.  Accordingly, School Officials such as Ned, Melendez, McHale, Stowers, and Narcisse were the final decision-makers and policymakers for many of the customs, practices, policies and procedures complained of herein as relates to Humble High School.

72.     Humble ISD established official policies regarding Transfers Related to Victims of Sexual Assaults, Child Sexual Abuse and Other Maltreatment of Children, Sexual Harassment and Gender-Based Harassment, and Sexual Acts and Sexual Harassment, yet gave lip service to these policies.

73.     Defendants established other policies that led to the constitutional violations that are complained of herein.  For instance, Defendants had the following policies, inter alia: (a) endorsing teachers/instructors having lunch or going on other trips, off school grounds, alone with students; (b) permitting teachers/instructors to go on out-of-town trips with minor students, without having parents present as chaperons; (c) encouraging students to share hotel rooms with teachers/instructors during school trips; (d) permitting excessive physical touching between teachers/instructors and students; (e) allowing students to live with teachers/instructors with whom they are not related; (f) delaying (or not responding) to complaints from parents and students regarding potential inappropriate teacher-student relationships.

74.     In addition, Humble ISD and the School Officials did not implement the policies addressing sexual abuse and other maltreatment of children.  Nor did Defendants discuss with parents the sexual abuse policy in any informational handbook provided to students and parents as required by law.  The failure to adopt and/or implement these policies contributed to the violations complained of herein.

75.     Neither the Humble ISD nor the School Officials adequately trained school staff on how to recognize, report, and investigate signs of potential sexual abuse or improper teacher-student relationships so that abuse could be prevented.

76.     Neither the Humble ISD nor the School Officials adequately trained, supervised and/or disciplined its employees on Defendants' official policies regarding Transfers Related to

Victims of Sexual Assaults, Child Sexual Abuse and Other Maltreatment of Children, Sexual Harassment and Gender-Based Harassment, and Sexual Acts and Sexual Harassment.

77.     These unacceptable customs and policies, and failures to train and discipline on them, contributed to the conduct against A.W. complained of herein.  All Defendants had a pivotal role in establishing and maintaining the unconstitutional practices and customs that led to the manner in which A.W. was treated.

## AFTER A.W. GRADUATES FEENSTRA CONTINUES TO STALKS HER

78.     After A.W. graduated from Humble High School, she initially believed that she was managing to escape Feenstra's manipulative grasp and control.

79.     However, Feenstra continued to call A.W.'s phone, text her and stalk A.W. at work, at home, and at school, to the point where A.W. and her mother were in fear of what Feenstra would do.

## FEENSTRA IS ARRESTED, CHARGED AND PLEADS GUILTY

80.     Eventually, after receiving spiritual guidance at her church, A.W. decided to speak up regarding what Feenstra did to her.  A.W. ultimately spoke with Chelsea Jenkins, a former dance instructor at Humble High School, about what went on with Feenstra.  Jenkins reported it to school authorities.

81.     As a result, in or about March 2013, Feenstra was arrested and charged with a felony of Improper Relationship with Student, arising out of Feenstra intentionally and knowingly engaging in Deviate Sexual Intercourse with A.W., a student.

82.     On or about October, 23, 2013, Feenstra pleaded guilty to an improper relationship with a student and was sentenced to 10 years deferred adjudication and probation.

# VI.
## CAUSES OF ACTION

### COUNT ONE:
### CLAIMS UNDER 20 U.S.C. § 1681

83.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

84.    Humble ISD is a public educational system that receives federal financial assistance from the United States government and is subject to the applicability of Title IX of the Education Act of 1972, 20 U.S.C.A. § 1681.

85.    A.W. was an African-American female student at Humble High School and, as such, a member of two protected classes under Title IX of the Education Amendments of 1972, *supra*.

86.    School Officials were all employees of Humble ISD and all were vested with the power and authority to address the discrimination and assaults and to have instituted corrective measures on A.W.'s behalf.  Yet none of the School Officials instituted corrective measures.

87.    At a minimum, the School Officials had actual notice of the discrimination against A.W. as well as the inappropriate relationship between Feenstra and A.W. since certain of the conduct happened openly and the School Officials were otherwise informed of other improper conduct.

88.    During 2009-2011 at Humble High School, A.W. was subjected to severe, pervasively hostile, and objectively offensive sexual harassment and sexual abuse, as well as racial and gender discrimination, in that she was forced to endure repeated sexual assaults, unwanted touching and effective rapes.  A.W. did not request or invite this conduct and regarded it as undesirable and offensive.

16

89.     While a student at Humble High School, A.W. also encountered quid pro quo harassment, where one or more of the Defendants conditioned educational decisions or benefits (e.g. A.W.'s grades, dance team membership, and college preparation assistance) on A.W.'s submission to unwelcome sexual conduct.

90.     The type, frequency and duration of the unwelcome harassment and sexual assaults A.W. endured affected A.W.'s education and her relationship with her fellow students at Humble High School and led to an extremely hostile environment at school.

91.     No male students had to undergo the type of severe unwanted touching, harassment and repeated sexual assaults that A.W. endured and no male students were forced to sleep with teachers/instructors during out-of-town trips.   Humble ISD's overnight sleeping arrangements' policy was different for male students than for female students.

92.     A.W., an African-American, was forced to sleep in the bed with a Caucasian teacher, who repeatedly touched her in a sexual manner.   None of the non-Black students was forced to endure the sexual assaults that A.W. went through and none was treated with the indifference from School Officials with which A.W. was treated.

93.     The discrimination, sexual harassment and sexual assaults undermined and detracted from A.W.'s educational experience in that she was denied equal access to the school's resources and educational opportunities. A.W. was effectively barred from accessing the full educational benefits and other opportunities provided by the school because the discrimination, harassment, unwanted touching, and sexual assaults had a devastatingly adverse impact on her ability to perform academically, socially, and to otherwise be a fully participating member in the school community.   The negative impact includes, but is not limited to, the following:

a.   Being terrified to go to school each day and having numerous bouts of depression, low self-esteem and sleepless nights, asking herself why the assaults and discrimination were happening to her;

b.   Trying to figure out ways to avoid her harasser and feeling helpless;

c.   Being unable to focus on her school work and extracurricular activities because of her preoccupation with being dragged away and controlled by her sexual assaulter;

d.   Being unable to maintain her grades and enhance her ability to obtain college scholarships; and

e.   Unable to focus on her school work and extracurricular activities because of the School Officials' demonstrated failure and unwillingness to protect her from her sexual assaulter.

94.   Humble ISD and the School Officials had actual knowledge of, and were deliberately indifferent to, the harassment and sexual assaults endured by A.W., and their actions and inactions were clearly unreasonable in light of the known circumstances in the following ways, among others:

a.   Despite observing the inordinate amount of personal attention being paid by Feenstra towards A.W., the School Officials did nothing;

b.   Although parents complained to School Officials that there was something unusual about Feenstra's relationship with A.W., the School Officials did nothing.  Rather than investigate, the School Officials engaged in a pattern of ignoring the complaints and allowing the conduct to continue;

c.   Despite hearing that Feenstra often made inappropriate comments about A.W.'s body parts, using a sexually suggestive tone, the School Officials did nothing;

d.   Failure to fully investigate Feenstra's background to ascertain whether she had been involved in other suspicious behavior, etc.;

e.   School Officials failed to report the complaints and suspicions to the Division of Family Services or in accordance with the Texas Education Code, Texas Administrative Code and Family Code;

f.   Failure to establish sexual abuse and harassment policy in accordance with the Texas Education Code, Texas Administrative Code and/or Texas Family Code;

g.   Failure to adopt and implement a policy addressing sexual abuse and other maltreatment of children, to be included in the district improvement plan under Section 11.252 and any informational handbook provided to students and parents;

  h. Failure to properly train teachers, administrators and other staff on the official policies regarding Transfers Related to Victims of Sexual Assaults, Child Sexual Abuse and Other Maltreatment of Children, Sexual Harassment and Gender-Based Harassment, and Sexual Acts and Sexual Harassment and other applicable policies;

  i. Despite observing that Feenstra would regularly take A.W. away from the school grounds to have one-on-one lunches and meetings with her during school hours, the School Officials did nothing;

  j. Despite observing the inordinate amount of physical touching during school activities by Feenstra towards A.W., the School Officials did nothing;

  k. Despite observing that Feenstra would routinely summons A.W. into her office and lock the door for long periods of time with just the two of them in the office, the School Officials did nothing;

  l. Despite being aware that during out-of-town trips, Feenstra ordered A.W. to sleep in the same bed with her, the School Officials did nothing; and

  m. Although School Officials were aware that Feenstra convinced A.W. to move into Feenstra's residence with her while A.W. was still a minor, the School Officials encouraged the move-in and did nothing.

95. As a direct and proximate result of Humble ISD's and the School Officials' deliberate indifference to the reported acts of severe and objectively inappropriate discrimination, harassment, and sexual assault of A.W. that occurred under Defendants' control, Plaintiffs have suffered damages in an amount in excess of the jurisdictional limits of this Court.

## COUNT TWO:
### CLAIMS UNDER 42 U.S.C. §1983 FOR DENIAL OF EQUAL PROTECTION UNDER THE LAW AS REQUIRED BY THE 14TH AMENDMENT TO THE U.S. CONSTITUTION

96. Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

97. As a female and an African-American, A.W. is a member of identifiable classes.

98. As supervisors at a state run institution, School Officials had a duty of care to protect A.W. from harassment and sexual abuse equally to the protection of other students, regardless of race, sex, or status of relationship as same-sex.

99.     The Defendants, acting under color of law and acting pursuant to customs, practices and policies, official and/or unofficial, of Humble ISD deprived A.W. of rights and privileges secured to her by the Fourteenth Amendment to the United States Constitution and by other laws of the United States, by failing to provide equal protection and impacting her liberty interest in her bodily integrity in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

100.    Humble ISD has official policies pursuant to the Texas Education Code and Humble ISD allegedly developed policies and procedures for dealing with issues of sexual harassment and sexual assaults in schools.

101.    In addition, Humble ISD failed to adequately train its employees regarding responding to and conducting investigations of sexual assaults, inappropriate teacher-student relationships, and discrimination.  This failure to train its employees in a relevant respect reflects a deliberate indifference to the rights of the school students and is actionable under 42 U.S.C. § 1983.

102.    Humble ISD has a policy, practice, or custom, official and/or unofficial, that provides less protection (e.g. by not responding at all or purposefully delaying its response) to complaints involving female victims of suspected sexual assault from same-sex teachers than to victims of other assaults.  This discrimination against female same-sex relationships was a motivating factor in Defendants' refusal to investigate the nature of the relationship between Feenstra and A.W., when it was first noticed by School Officials.

103.    Humble ISD also has a policy, practice, or custom, official and/or unofficial that provides less protection to African-American victims of improper teacher-student contact than to other suspected victims.  This discrimination against African-American victims was a motivating

factor in Defendants' refusal to investigate the nature of the relationship between Feenstra and A.W., when it was first noticed by School Officials.

104.    Defendants, acting through official and/or unofficial policies, practices, and/or customs, and with deliberate, callous, and conscious indifference to A.W.'s constitutional rights failed to implement the policies, procedures; and practices necessary to provide constitutionally adequate protection and assistance to A.W. during her pleas for assistance and implemented policies, procedures, and practices that actually interfered with or prevented A.W. from receiving the protection, assistance and care she deserved.

105.    For instance, the following conduct, policies, and accepted customs, *inter alia*, by Defendants violated A.W.'s constitutional rights:

      a.    Humble ISD's failure to adequately train employees how to properly recognize and prevent improper teacher-student relationships;

      b.    Failure to properly discipline its employees;

      c.    Failure to protect A.W. from known sexual harassment and abuse;

      d.    Failure to follow the requirements of the Texas Education Code, Texas Administrative Code and Family Code requiring the establishment of a sexual abuse and harassment policy, as well as failure to train on the policies and failure to report suspected violations;

      e.    Failure to properly train teachers, administrators and other staff on the official policies regarding Transfers Related to Victims of Sexual Assaults, Child Sexual Abuse and Other Maltreatment of Children, Sexual Harassment and Gender-Based Harassment, and Sexual Acts and Sexual Harassment and other applicable policies;

      f.    Giving lower priority to complaints about suspected improper teacher-student relationships between female same-sex teacher-students complaints than to other complaints;

      g.    Failing to prioritize complaints about the relationship Feenstra was developing with A.W. the way Defendants would have had A.W. not been African-American and Feenstra Caucasian;

      h.    Endorsing a policy of teachers/instructors having lunch or engaging in other activities, off school grounds, alone with students;

      i.    The policy of permitting teachers/instructors to go on out-of-town trips with minor students, without having parents present;

j.     The policy of encouraging students to share hotel rooms with teachers/instructors;

k.     The policy of permitting excessive physical touching between teachers/instructors and students; and

l.     The policy of allowing students to live in homes with teachers/instructors with whom the student is not related.

106.    In addition, Humble ISD and the School Officials failed and refused to adopted implement customs, policies, practices or procedures, and failed to train its personnel adequately on the appropriate policies, practices or procedures regarding the handling of improper teacher-student relationships and out-of town travel.  In so doing, Defendants knew that they were acting against the clear dictates of current law, and knew that as a direct consequence of their deliberate decisions, the very situation that occurred -- *i.e.*, harassment, sexual assaults, effective rapes, and mental anguish -- in all reasonable probability would occur.

107.    At the time of the harassment and sexual assaults, Humble ISD and School Officials knew that A.W. was an African-American female and a minor.   Additionally, Defendants knew that A.W.'s mother and other parents complained about the improper relationship between Feenstra and A.W., yet School Officials took no steps to investigate the relationship. Therefore, racial and same-sex female classifications factored into the way Defendants handled the complaints being made about Feenstra's relationship with A.W.

108.    Defendants' actions also demonstrate that before A.W. left Humble High School, she was the victim of purposeful discrimination, because of her race, gender, and/or same-sex classification or due to an irrational or arbitrary state classification unrelated to a legitimate state objective.

109.    Additionally, no rational basis existed for the Defendants' policies of affording female victims of same-sex teacher-student relationships less protection or assistance than other victims or giving these victims less investigative attention than other victims.

110.    In addition to the conduct above, Defendants violated A.W.'s rights, *inter alia*, when they failed to prevent the occurrence of an improper teacher-student relationship, encouraged the relationship between Feensta and A.W., refused to investigate the early complaints of the improper teacher-student relationship, failed to prevent Feenstra from forcing A.W. to sleep in the same bed during school trips, failed to prevent Feenstra from locking the doors to rooms at the school to engage in deviate sexual practices on A.W., and refused to alert the proper authorities of the improper teacher-student relationship between Feenstra and A.W. The collective actions of the School Officials demonstrate that these practices are so common and well-settled as to constitute a custom that fairly represents municipal policy.

111.    A.W. was also treated differently than similarly situated children at Humble High School, especially those from more affluent neighborhoods or of different races.  This disparity in treatment deliberately deprived A.W. of due process and equal protection of the law.

112.    Moreover, the Humble ISD also clearly had a duty to protect A.W. since the School Officials had knowledge of specific complaints by students and parents of the relationship that Feenstra had with A.W., yet refused to act to give her proper assistance, information or protection.

113.    Feenstra, Sconzo, Ned, McHale, Melendez, Stowers, and Narcisse acted independently during some of the conduct or omissions complained of herein and within the general scope of his or her employment during other conduct or inaction.

114.    At the time of the conduct alleged, the School Officials were performing ministerial, not discretionary, duties, the breach of which led to Plaintiffs' damages.

115.    Additionally, to the extent any of the individual School Officials were not involved in the decision to ignore the improper relationship and not provide A.W. with

protection from Feenstra's assaults, Sconzo, Ned, McHale, Melendez, Stowers, and Narcisse would be liable as a bystander perpetrator since they (a) knew that a fellow staffer was violating A.W.'s constitutional rights, and (b) had a reasonable opportunity to prevent the harm by ensuring that the complaints were investigated or that the unwanted relationship ceased, and (c) chose not to act.

116.    Moreover, no reasonably competent official would have concluded that the actions of the Feenstra, Sconzo, Ned, McHale, Melendez, Stowers, and Narcisse described herein would not violate A.W.'s rights.  In other words, no reasonably prudent employee, supervisor or officer, under similar circumstances, could have believed that their conduct was justified.

117.    No rational basis existed for the Defendants' alleged policy of affording female same-sex victims less assistance than other victims.

118.    In addition, A.W., individually, was intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.

119.    Arguing in the alternative, if A.W. was not treated differently solely because she was a member of one or more of the protected classes, she was intentionally treated differently as a "class of one," in that Defendants singularly discriminated against A.W. and treated the relationship she had with Feenstra differently than any other similarly situated teacher-student relationship.  In other words, Humble ISD, upon information and belief, followed district policy regarding other incidents of improper teacher-student relationships.  Defendants had no rational basis for the disparate treatment of otherwise like individuals.  Furthermore, no other suspected teacher-student relationships were ignored and cavalierly dismissed in the same fashion.

**COUNT THREE:**

**CLAIMS UNDER 42 U.S.C. §1983 FOR DENIAL OF LIBERTY INTEREST IN BODILY INTEGRITY UNDER THE LAW AS REQUIRED BYTHE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION**

120.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

121.    School Officials were all employees of Humble ISD, a governmental body created by statute to provide public education to the children who reside within its boundaries, and during all relevant time period, acted under the color of state law.

122.    The School Officials actions and omissions impacted upon A.W.'s Fourteenth Amendment right under the Due Process Clause to a liberty interest in her bodily integrity.

123.    As a female and an African-American, A.W. is a member of identifiable classes.

124.    School Officials were aware of multiple complaints from parents regarding the inappropriate relationship between Feenstra and A.W., yet the School Officials never had a hearing or conference to discuss the concerns of A.W.'s mother and the other parents.

125.    School Officials were aware of, and encouraged, A.W. to move into Feenstra's home, where Feenstra would have unlimited access to A.W. to commit untold sex acts upon her. The School Officials' conduct and ratification of this living arrangement, as well as Feenstra's and A.W.'s hotel sleeping arrangements during school trips, also imposed limitations on A.W.'s freedom to act on her own behalf.

126.    School Officials' conduct, by failing to conduct a reasonable investigation into the various complaints, failing to protect A.W. from her rapist, and allowing Feenstra to move A.W. into her residence, emboldened A.W.'s rapist and left A.W. more vulnerable than before, placing her at a significant risk of serious, immediate, and proximate harm.

127.    The risk to A.W.'s personal safety was known, or should have been known, to School Officials from an investigation into Feenstra's past and concurrent conduct, and as a result of their actual knowledge could have taken steps to conduct a reasonable investigation and put a stop to the sexual assaults.

128.    A.W's constitutional interests and her right to be free from rape, sexual assault, and sexual harassment were clearly established at all relevant times.

129.    School Officials were aware of A.W's constitutional interests and her right to be free from rape, sexual assault, and harassment but failed to take any steps to protect these rights.

130.    School Officials acted recklessly in conscious disregard of and with deliberate indifference to the risk to A.W.'s safety by failing to conduct an investigation into the improper teacher-student relationship, as well as complaints stemming from it, and by failing to provide A.W. with any protection from her sexual abuser.

131.    As a direct result, A.W. was subjected to unwanted touching, harassment, rape, multiple sexual assaults and mental anguish.

132.    The School Officials' conduct, as described herein, shocks the conscience.

133.    The School Officials' conduct was intentional, willful, wanton, and displayed a deliberate, callous, and conscious indifference to A.W.'s federally protected rights.

134.    As the direct and proximate result of School Officials' deliberate indifference to known acts of constitutional deprivation, A.W. suffered damages, for which she now seeks to recover.

## <u>COUNT FOUR:</u>
## FAILURE TO ADEQUATELY TRAIN, SUPERVISE AND DISCIPLINE EMPLOYEES

135.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

136.    Defendants failed to establish a sufficient and effective sexual abuse and harassment policy in accordance with the Texas Education Code, Texas Administrative Code and/or Texas Family Code.

137.    Defendants failed to properly train teachers, administrators and other staff on the official policies regarding Transfers Related to Victims of Sexual Assaults, Child Sexual Abuse and Other Maltreatment of Children, Sexual Harassment and Gender-Based Harassment, and Sexual Acts and Sexual Harassment.

138.    Humble ISD failed to adequately train and discipline its employees in the handling and investigation of allegations of sexual harassment and abuse.

139.    Humble ISD's failures to train and discipline its employees reflect a reckless disregard for or deliberate indifference to the rights of students, such that the inadequate training or supervision represents Humble ISD's policy.

140.    Humble ISD's failures to discipline its employees for having inappropriate teacher-student interactions reflect a reckless disregard for or deliberate indifference to the rights of students, such that the inadequate supervision and discipline represents Humble ISD's policy.

141.    The investigation of allegations or suspicions of inappropriate teacher-student relationships and sexual assault is a recurring necessity in which there is an obvious potential for violations, and in which there is an obvious need for training and discipline to avoid violations of citizens' and students' rights.

142.    The implementation of measures to protect school children from known or suspected acts of inappropriate teacher-student relationships and sexual assault is necessary to correct potentially recurring activity in which there is an obvious potential for constitutional

deprivations and an obvious need for training and discipline to avoid violations of citizens' and students' rights.

143.    The lack of supervision and discipline emboldened Feenstra and allowed her to manipulate, coerce and use threats to sexually abuse A.W.

144.    Humble ISD's and the School Officials' failure to investigate the allegations of the inappropriate teacher-student relationship and/or to implement measures to protect school children from known or suspected acts of inappropriate teacher-student relationships and sexual assault was the actual and proximate cause of constitutional deprivations, repeated sexual assaults and effective rapes committed against A.W.

145.    As a direct and proximate result of Defendants' policy of failing to train, supervise, and discipline their employees, Plaintiffs have suffered damages for which Plaintiffs seek to recover.

## COUNT FIVE:
## SEXUAL ASSAULT AND BATTERY

146.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

147.    During the period complained of, Feenstra intentionally, knowingly and repeatedly made contact with A.W.'s body parts including, but not limited to, A.W.'s lips, breasts, shoulders, buttocks, vagina and legs.

148.    Feenstra also intentionally, knowingly and repeatedly inserted her fingers, tongue, and other inanimate objects into A.W.'s vagina in a manner that caused A.W. to experience pain, embarrassment, uncomfortableness, and mental anguish.

149.     Feenstra knew or should have known that A.W., especially considering that A.W. was a virgin, heterosexual, and a minor, would regard the sexual contact as offensive and provocative.

150.     The contact complained of has caused Plaintiffs irreparable harm.

151.     Humble ISD and the School Officials facilitated the assaults by their negligent hiring, supervision, discipline and training of their employees.

152.     Humble ISD and the School Officials facilitated the assaults by their failure to investigate the allegations of Feenstra's inappropriate teacher-student relationship with A.W. and/or to implement measures to protect school children from known or suspected acts of inappropriate teacher-student relationships and sexual assaults.

153.     As a direct and proximate result of the Defendants' conduct, Plaintiffs have suffered actual and exemplary damages for which Plaintiffs now seek to recover.

## <u>COUNT SIX:</u>
## NEGLIGENCE AND GROSS NEGLIGENCE

154.     Plaintiffs reallege and incorporate by reference each of the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

155.     Humble ISD and School Officials owed a duty to Plaintiffs to provide A.W. with a safe public school education consistent with her constitutional and statutory rights and to perform a reasonable investigation of any claims of improper teacher-student relationship, harassment and/or sexual assault that were observed and/or brought to their attention.

156.     Accordingly, by their actions described herein, Defendants breached their duty and were negligent, grossly negligent and/or acted with malice in at least the following regards:

   a.     Failing to conduct a reasonable investigation into the relationship between Feenstra and A.W.;

b.    Failure to recognize the severity of the relationship that developed between Feenstra and A.W.;

c.    Failure to have A.W. examined by qualified medical and psychological personnel to determine if the relationship A.W. had with Feenstra was beyond the bounds of a teacher-student relationship;

d.    Failure to institute a system that would ensure that suspicions of improper teacher-student relationship receive a high priority of responsiveness;

e.    Failure to adequately train employees how to properly recognize and prevent improper teacher-student relationships;

f.    Failure to instruct and supervise employees regarding the proper evaluation of teacher-student relationships;

g.    Failure to instruct and supervise employees regarding the importance of having parents accompany students at all times during out-of town trips;

h.    Failure to institute adequate policies and procedures to ensure that parents would always be present during school events off school grounds;

i.    Failure to follow the requirements of the Texas Education Code, Texas Administrative Code and Family Code requiring the establishment of a sexual abuse and harassment policy, as well as failure to train on the policies and failure to report suspected violations;

j.    Failure to properly train teachers, administrators and other staff on the official policies regarding Transfers Related to Victims of Sexual Assaults, Child Sexual Abuse and Other Maltreatment of Children, Sexual Harassment and Gender-Based Harassment, and Sexual Acts and Sexual Harassment;

k.    Giving lower priority to complaints about suspected improper teacher-student relationships between female same-sex teacher-students complaints than to other complaints;

l.    Failing to prioritize complaints about the relationship Feenstra was developing with A.W. the way Defendants would have had A.W. not been African-American and Feenstra a Caucasian;

m.    Endorsing a policy of teachers/instructors having lunch or engaging in other activities, off school grounds, alone with students;

n.    The policy of permitting teachers/instructors to go on out-of-town trips with minor students, without having parents present;

o.    The policy of encouraging students to share hotel rooms with teachers/instructors;

p.    The policy of permitting excessive physical touching between teachers/instructors and students; and

q.    The policy of allowing students to live in homes with teachers/instructors with whom the student is not related.

r.      Negligent implementation of existing policies;

s.      Negligent hiring, retention and assignments;

t.      Negligent supervision, training, and direction;

u.      Using defective or inadequate monitoring or security equipment that did not adequately capture the rapes or sexual assaults that occurred on school grounds;

v.      Refusing to get more staff properly trained to professionally handle complaints from parents about teacher-student relationships; and

w.      Negligent failure to discipline teachers, administrators, and investigating officers.

157.    Upon information and belief, the School Officials acted independently during some of the conduct or omissions complained of herein and within the general scope of his or her employment during other conduct or omissions.

158.    No reasonably competent official would have concluded that the actions of the School Officials would not lead to injury and damages to A.W.  In other words, no reasonably prudent call teacher, administrator or school officer, under similar circumstances, could have believed that their conduct was justified.

159.    Defendants' conduct described above constitutes gross negligence, recklessness, and/or intentional misconduct.

## COUNT SEVEN:
### BYSTANDER RECOVERY

160.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

161.    Mary King White exhibited shock resulting from a direct emotional impact upon her from the sensory and contemporaneous observance of the impact on A.W. of discussing that Feenstra's open touching led to Feenstra engaging in deviate sexual activity with her daughter. Mary King White is A.W.'s mother.

162.    Mary King White suffered direct personal injury in the form of mental anguish and emotional distress from discovering the harassment, rape, and sexual assaults, which could have been prevented by Defendants.

## COUNT EIGHT:
### INFLICTION OF EMOTIONAL DISTRESS

163.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

164.    Defendants owed to A.W. a duty to provide her a safe public school education consistent with her constitutional and statutory rights and to perform a reasonable investigation into the improper teacher-student relationship, harassment, and sexual assaults.

165.    Defendants breached their duty to A.W. in one or more of the following ways, *inter alia*:

a.    Failing to conduct a reasonable investigation into the relationship between Feenstra and A.W.;

b.    Failure to recognize the severity of the relationship that developed between Feenstra and A.W.;

c.    Failure to have A.W. examined by qualified medical and psychological personnel to determine if the relationship A.W. had with Feenstra was beyond the bounds of a teacher-student relationship;

d.    Failure to institute a system that would ensure that suspicions of improper teacher-student relationship receive a high priority of responsiveness;

e.    Failure to adequately train employees how to properly recognize and prevent improper teacher-student relationships;

f.    Failure to instruct and supervise employees regarding the proper evaluation of teacher-student relationships;

g.    Failure to instruct and supervise employees regarding the importance of having parents accompany students at all times during out-of town trips;

h.    Failure to institute adequate policies and procedures to ensure that parents would always be present during school events off school grounds;

i.    Failure to follow the requirements of the Texas Education Code, Texas Administrative Code and Family Code requiring the establishment of a

sexual abuse and harassment policy, as well as failure to train on the policies and failure to report suspected violations;

j.   Failure to properly train teachers, administrators and other staff on the official policies regarding Transfers Related to Victims of Sexual Assaults, Child Sexual Abuse and Other Maltreatment of Children, Sexual Harassment and Gender-Based Harassment, and Sexual Acts and Sexual Harassment;

k.   Giving lower priority to complaints about suspected improper teacher-student relationships between female same-sex teacher-students complaints than to other complaints;

l.   Failing to prioritize complaints about the relationship Feenstra was developing with A.W. the way Defendants would have had A.W. not been African-American and Feenstra a Caucasian;

m.   Endorsing a policy of teachers/instructors having lunch or engaging in other activities, off school grounds, alone with students;

n.   The policy of permitting teachers/instructors to go on out-of-town trips with minor students, without having parents present;

o.   The policy of encouraging students to share hotel rooms with teachers/instructors;

p.   The policy of permitting excessive physical touching between teachers/instructors and students; and

q.   The policy of allowing students to live in homes with teachers/instructors with whom the student is not related.

r.   Negligent implementation of existing policies;

s.   Negligent hiring, retention and assignments;

t.   Negligent supervision, training, and direction;

u.   Using defective or inadequate monitoring or security equipment that did not adequately capture the rapes or sexual assaults that occurred on school grounds;

v.   Refusing to get more staff properly trained to professionally handle complaints from parents about teacher-student relationships; and

w.   Negligent failure to discipline teachers, administrators, and investigating officers.

166.   Defendants' breach of their duty to A.W. arose to the level of recklessness and gross negligence.

167.   Defendants' breach of their duty to A.W. was a direct and proximate cause of A.W. being repeatedly sexually assaulted by Feenstra while A.W. was a student.

168.     Defendants' breach of duty directly and proximately caused Plaintiffs to suffer damages from emotional distress from the harassment, rapes, sexual assaults, mind control as well as from medically traumatizing A.W. in her vagina, pelvic and buttocks area.

169.     Defendants knew or should have known that their conduct involved an unreasonable risk of causing emotional distress to Plaintiffs.

170.     Defendants' conduct caused Plaintiffs to suffer medically diagnosable and significant emotional distress.

171.     Defendants' acts and omissions demonstrated a conscious disregard for Plaintiffs' emotional well-being and safety, and the emotional well-being and safety of other students, such that an award of punitive damages is warranted.

## **DAMAGES– ALL DEFENDANTS**

172.     Defendants' acts and/or omissions were a proximate cause of the following injuries suffered by Plaintiffs, for which Plaintiffs seek recovery through this Complaint:

a.     Actual damages;

b.     That Humble ISD be required to initiate policies and training to enable staff to recognize and promptly investigate improper teacher-student interaction, stop harassment; and enforce laws against sexual assaults;

c.     Damages for denial of access to an educational environment free from harassment and sexual abuse;

d.     Denial of A.W.'s ability to take part in federally funded educational instruction and programs;

e.     Past, present, and future medical expenses for physical, emotional and mental health;

f.     Damages suffered in the form of past, present, and future physical, psychological and emotional pain and suffering, mental anguish;

g.     Loss of affection, consortium, comfort, financial assistance, protection, affection and care;

h.     Pain and suffering, emotional distress, and mental anguish suffered by Plaintiffs;

i.     Loss of quality and enjoyment of life;

j.     Loss of earnings and contributions;

k.    Exemplary and punitive damages as well as reasonable attorneys' fees and costs of court;

l.    Pursuant to 42 U.S.C. §1988, 20 U.S.C. §1681, and other applicable laws, Plaintiffs should be awarded reasonable attorney's fees for the preparation and trial of this cause of action, and for its appeal, if required;

m.   Prejudgment interest; and

n.    Post judgment interest.

173.   Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## EXEMPLARY DAMAGES

174.   Plaintiffs seek exemplary damages for injuries caused by Defendants' gross negligence under Texas Civil Practice & Remedies Code section 41.003(a)(3), as defined by Section 41.001(11).  Plaintiffs also seek exemplary damages as a result of Defendants' willful act or omission or gross neglect, as provided in Texas Constitution, article 16, section 26, and Texas Civil Practice & Remedies Code section 71.009.  Finally, Plaintiffs seek exemplary damages under any and all other statutes, acts, or law providing for such damages.

## CONDITIONS PRECEDENT

175.   Defendants have actual notice of Plaintiffs' injuries complained of herein.  The Defendants are not immune from suit or liability.  Any conditions precedent have occurred, been performed, or have been waived.

## DEMAND FOR JURY

176.   Plaintiffs hereby make demand for a jury trial.

## PRAYER

Wherefore, Premises Considered, Plaintiffs pray that Defendants be cited to appear and answer herein and, upon final trial hereof, that Plaintiffs have and recover from Defendants the

Plaintiffs' actual damages, exemplary damages, pre and post-judgment interest, costs of court, attorneys' fees, and such other and further relief, both general and special, at law and in equity, to which they may be justly entitled.

Respectfully Submitted,

/s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN
Federal Bar No. 14897
State Bar No. 16049750

**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com